IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>FELINA S. SALINAS,<br><br>Defendant. | CR. NO. 18-00108 JMS<br><br>ORDER DENYING DEFENDANT FELINA S. SALINAS' MOTION TO SUPPRESS STATEMENTS, ECF NO. 45 |

## ORDER DENYING DEFENDANT FELINA S. SALINAS' MOTION TO SUPPRESS STATEMENTS, ECF NO. 45

## I. INTRODUCTION

Defendant Felina S. Salinas ("Salinas") is charged by indictment with bulk cash smuggling, in violation of 31 U.S.C. § 5332(a) (Count 1), and accessory after the fact to bulk cash smuggling, in violation of 18 U.S.C. § 3 and 31 U.S.C. § 5332(a) (Count 2). ECF No. 24. These charges arise from a United States Customs and Border Protection ("CBP") inspection of an outbound private aircraft en route from Honolulu to the Philippines carrying two crew members and four passengers, including Salinas. *See* ECF No. 1. Salinas moves to suppress statements she made to CBP officers in a Signature Flight Support hangar at

Honolulu's Daniel K. Inouye International Airport on February 13, 2018, at 11:10 a.m.[1]

The court held an evidentiary hearing on the Motion to Suppress on September 18, 2019. The court has considered the record and filings in this case, the supporting and opposing memoranda, the arguments of counsel, and the credibility of the witnesses testifying at the hearing. Based on the following, the court finds and concludes that Salinas was not "in custody" on February 13, 2018 at 11:10 a.m. for purposes of *Miranda v. Arizona*, 384 U.S. 436 (1966). Statements that Salinas made to CBP officers at 11:10 a.m. are admissible even though she was not given *Miranda* warnings at the time. Accordingly, the Motion to Suppress is DENIED.

## II. <u>BACKGROUND</u>

### A.    **Factual Background**

Six witnesses testified during a September 18, 2019 evidentiary hearing: CBP Officers Ernest Durante ("Durante"), Wendy Suellan Lau-Castro ("Lau-Castro"), Marvin Mendoza ("Mendoza"), Vernon Kaahanui ("Kaahanui"), and Joseph Barino ("Barino"); and HSI Special Agent Ann Mylene Haney

---

[1] Salinas also moves to suppress statements she made to CBP officers later that day in the Homeland Security Investigations ("HSI") Border Enforcement Security Task Force ("BEST") office. The court need not address these statements because the Government "concedes that Defendant should have been advised of her *Miranda* rights before she was questioned at the HSI [BEST] office." ECF No. 53, at PageID #201.

("Haney"). The court also admitted 17 exhibits into evidence. The record and testimony of these witnesses are generally consistent as to the facts which are critical to determining whether Salinas' 11:10 a.m. statements resulted from a "custodial interrogation" for purposes of *Miranda*. Accordingly, based on its review of the evidence and testimony presented at the hearing, the court finds the following facts by a preponderance of the evidence. *See, e.g.*, *Missouri v. Seibert*, 542 U.S. 600, 608 n.1 (2004) (noting that the prosecution has the burden of proving, by a preponderance of the evidence, admissibility and voluntariness of statements).

At approximately 9:30 p.m. on February 12, 2018, Chief CBP Officer Scott Weatherly ("Weatherly") notified Durante that a private aircraft scheduled to depart Honolulu at 6 a.m. on February 13, 2018 was suspected of currency smuggling and directed Durante and his Anti-Terrorism Contraband Enforcement Team ("ATCET") to inspect the plane. ATCET is charged with the interdiction of narcotics, undeclared currency, and other contraband at the border from inbound and outbound aircraft, cargo, and passengers—its role is limited to conducting inspections. HSI is the Department of Homeland Security's criminal investigatory arm. A routine ATCET inspection includes announcing that an inspection is being conducted, having passengers complete currency declaration forms, examining all luggage, and asking passengers to identify their luggage.

Between 5:00 a.m. and 5:40 a.m. on February 13, 2018, Durante, Barino, Kaahanui, and Lau-Castro arrived at the Signature Flight Support area located on the property of the Daniel K. Inouye International Airport in Honolulu. At that time, it was raining and dark. CBP officers determined that luggage was already loaded in the cargo section of the plane, and that the passengers were neither in the lounge nor on the plane. Shortly thereafter, a car pulled up next to the plane, four individuals got out, and they boarded the plane.

After the plane door closed, at approximately 5:45 a.m., Durante banged on the door, ordered the flight crew to open the door, boarded, and announced that CBP would conduct an inspection. Durante directed the passengers—one of whom was Salinas—to disembark and go to the Signature lounge, where they joined a few Signature employees and at least two other individuals who were neither Signature employees nor passengers.

Barino walked the passengers to the lounge and once there, had them fill out CBP 503 currency declaration forms.[2] Salinas declared $40,000. Barino had her complete a second form—FinCEN Form 105, with Lau-Castro's assistance—on which Salinas again declared $40,000, and 1,000 Philippine pesos. The forms were completed by approximately 6:15 a.m.

---

[2] Apparently, the passengers were not required to fill out CBP 503 currency declaration forms at any time prior to this.

Meanwhile, at approximately 5:50 a.m., Kaahanui and a Signature employee began unloading luggage from the cargo of the plane for screening through the x-ray van that was brought to the plane. Because of heavy rain, at approximately 6:10 a.m., Kaahanui and the Signature employee determined that they would not use the x-ray van and proceeded to take the luggage to the Signature hangar for manual inspections. At approximately 6:15 a.m., Kaahanui discovered weapon parts in a duffle. Barino then entered the hangar to assist with the inspection and at 6:30 a.m. found more weapon parts in a gray suitcase. Kaahanui and Barino continued to inspect the remaining luggage.[3]

At approximately 6:15 a.m., Durante and Lau-Castro boarded and began to inspect the plane. Lau-Castro discovered currency in two bags—a red backpack and a black carry-on suitcase. The black suitcase had bundles of currency rolled up in black socks. Durante and Lau-Castro checked one or two socks and saw $100 bills rolled up. At approximately the same time that the currency was found, (1) Barino informed Durante that Salinas declared $40,000 and that no other passenger declared more than $10,000, and (2) Kaahanui informed Durante that he had found some weapon parts in a duffle. Durante paused or stopped the inspection inside the plane, and then he and Lau-Castro left

---

[3] Although there is no evidence of the exact number of bags removed from the plane, a photo (Gov't Ex. 53) shows a relatively large number of bags for just four passengers—at least nineteen bags—arrayed on the hangar floor.

the currency in the bags, did not attempt to identify who owned the bags, left the bags on the plane, and exited the plane. Durante called his supervisor to inform him that they had found currency and weapon parts and asked for assistance. Following this request and at various times throughout the morning, CBP Officers Robert Tapia, Marvin Mendoza, Adam Wong, as well as Weatherly and Supervisory CBP Officer John Beyer arrived at the scene.

Initially, passengers in the Signature lounge could see into the hangar through a large window on one wall of the lounge. After weapon parts were found, the bags were set out on the floor of the hangar. Barino went back into the Signature lounge and asked the passengers who owned the duffle bag and gray suitcase. A male passenger stated that the bags were his. That passenger was allowed to remain in the lounge and his bags were left in the hangar. At some later time, the window screen was lowered, blocking the passengers' view into the hangar.

Around 7:30 a.m., HSI Special Agents Haney and James Chambers arrived.[4] Haney testified that upon learning of events, she knew that someone was trying to smuggle undeclared cash but did not know the name or gender of that person. Durante showed Haney and Chambers the bags of currency inside the

---

[4] HSI is often present during routine CBP inspections, whether or not there is prior notification of suspected contraband. And when present, HSI's role is to observe the inspection.

plane, told them that the passengers had filled out currency forms, and that Salinas declared $40,000. Haney testified that she was satisfied that a large amount of undeclared cash was inside the black carry-on suitcase. That is, Haney testified that she had probable cause to believe that *someone* committed a crime, but she did not know *who* committed it. At that point, Haney told Durante to continue the inspection while Chambers contacted the United States Attorney's Office.[5] The bags were left on the plane, and at approximately 7:55 a.m., Mendoza arrived and helped Durante take photos of both the outside and inside of the plane, and of the bags with currency. At that time, Durante and Mendoza checked at least two of the socks and found that each contained approximately $10,000.

Between 8:00 a.m. and 8:20 a.m., Lau-Castro, with Haney as witness, took the two female passengers and one female guest in the lounge, one at a time, to the restroom for a pat-down. No handcuffs were used, and no weapons were displayed. Haney did not identify herself as an HSI Special Agent and did not

---

[5] There is some discrepancy about who was in charge of the inspection after Haney and Chambers arrived. Durante testified that he had only paused his inspection on the plane and that he did not need or take direction from Haney about resuming his inspection. Kaahanui testified that he and Barino continued to inspect the luggage in the hangar after finding weapon parts. He further testified that he did not take direction from Haney or Chambers, nor did he see Haney or Chambers give orders to CBP officers. Haney testified that Assistant United States Attorney Tom Brady told Chambers to continue with the inspection, and that her understanding was that Durante and his team had not completed their inspection. But Haney credibly testified that neither she nor Chambers assumed control of the inspection.

interact with the women being patted down. No contraband was found on these individuals.

At approximately 8:30 a.m., Durante started taking photos of the bags containing weapon parts, and the cargo luggage that was set out on the hangar floor. Around 9:20 a.m., a Honolulu Police Department canine unit arrived and examined the luggage in the hangar. Around 9:30 a.m., the canine unit examined the luggage inside the plane. At approximately 9:35 a.m., Durante and Barino began a final inspection inside the plane and found a purple wallet containing approximately $4,400 inside a blue purse. Thereafter, they removed the carry-on luggage from inside the plane and placed it in the hangar.

Around 10:00 a.m., Durante directed Kaahanui and another CBP officer to complete the necessary forms to detain the plane. At approximately 11:05 a.m., Durante told Haney and Chambers that approximately $40,000 was found in a red backpack, that $4,400 and identification cards belonging to Salinas were found in the purple wallet, and multiple stacks of $100 bills were concealed in 36 black socks inside a black carry-on suitcase. None of the currency was ever visible to the passengers in the lounge, nor was it brought to the lounge.

At 11:10 a.m., Durante and/or Barino brought Salinas into the hangar and asked her to identify her luggage from the array of both carry-on and cargo luggage on the hangar floor. At this time, neither the currency nor weapons were

displayed or shown to Salinas or any other passenger.  Salinas identified the red

backpack, purple wallet, and black carry-on suitcase, but not the blue purse, as

hers.  Durante took photos of Salinas next to her luggage, after which Salinas

returned to the Signature lounge and her luggage was returned to the array.  The

other female passenger was then brought into the hangar, at which time she

identified the blue purse, but not the purple wallet, as hers.  At approximately

12:30 p.m., Salinas was taken to the HSI BEST office for further questioning by

HSI agents, and Durante instructed Kaahanui and Barino to start an inventory of

her bags and currency.

      The Signature lounge had padded couches and chairs, tables,

restrooms, and some vending machines.  The passengers and two members of the

public were not ordered to sit in any particular seat and they spread out in the

lounge.  They were not forbidden from talking to one another or from using the

bathroom.[6]  A few Signature employees wearing yellow vests entered and exited

---

[6] It is not clear whether the passengers were told they could or could not use their phones while detained.  Barino testified that, to his knowledge, the passengers were not instructed one way or the other, nor did he know of any standard procedure prohibiting their use of phones.  Durante testified that technically, when undergoing an inspection, an individual should not use a phone.  Lau-Castro testified that in her experience—she worked as a primary processing officer checking passports and customs declarations in the main airport, and did not usually participate in ATCET inspections—it was standard policy that during CBP inspections, the use of phones is not allowed.  Lau-Castro further testified that she therefore stopped one male in the lounge from using his phone.  But Lau-Castro was not in the Signature lounge at all times and there is no evidence one way or the other about whether any other passenger used, or was prevented from using, a phone.

the lounge throughout the morning.  At all times, except when Durante was

banging on the plane door and using a raised voice to get the flight crew to open

the door, all instructions by officers to passengers were issued in conversational

tones.  All officers/agents were in uniform, wore badges, and carried, but did not

display, firearms.  No passenger was handcuffed.  There is no dispute that Salinas

was detained, and was not allowed to leave, for the duration of the CBP inspection.

At all times while Salinas was detained in the Signature lounge, at least one CBP

officer was present.

## B.    Procedural Background

On August 6, 2019, Salinas filed the instant Motion to Suppress.  ECF

No. 45.  The Government filed its Response on August 20, 2019.  ECF No. 53.  On

September 10, 2019, the court directed the parties to file supplemental briefing.

ECF No. 65.  On September 13, 2019, Salinas filed a Reply and the Government

filed a Supplemental Memorandum in Opposition.  ECF Nos. 67-68.  An

evidentiary hearing was held on September 18, 2019.  ECF No. 75.

## III. <u>DISCUSSION</u>

## A.    Legal Standards

"[T]he prosecution may not use statements, whether exculpatory or

inculpatory, stemming from custodial interrogation of the defendant unless it

demonstrates the use of procedural safeguards effective to secure the privilege

against self-incrimination." *Miranda*, 384 U.S. at 444. *Miranda* requires a person subjected to a custodial interrogation to be "warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Id.* For *Miranda* to apply, "a person must have been both in custody and subjected to interrogation." *United States v. Rommy*, 506 F.3d 108, 132 (2d Cir. 2007); *see also, e.g.*, *United States v. Washington*, 462 F.3d 1124, 1132 (9th Cir. 2006) (analyzing "interrogation" separately from "custody"). Custody is defined as "formal arrest or restraint on freedom of movement of the degree associated with formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (citation and quotation marks omitted). And interrogation occurs when "under all the circumstances involved in a given case, the questions are 'reasonably likely to elicit an incriminating response from the suspect.'" *United States v. Booth*, 669 F.2d 1231, 1237 (9th Cir. 1981) (quoting *Rhode Island v. Innis*, 446 U.S. 294, 301 (1980)).

It is well settled, however, that "special rules apply at the border." *United States v. Butler*, 249 F.3d 1094, 1098 (9th Cir. 2001) (citing *United States v. Leasure*, 122 F.3d 837 (9th Cir. 1997)). "Detention and questioning during routine searches at the border are considered reasonable within the meaning of the Fourth Amendment." *United States v. Bravo*, 295 F.3d 1002, 1008 (9th Cir. 2002)

(citing *United States v. Espericueta-Reyes*, 631 F.2d 616, 622 (9th Cir. 1980) (other citation omitted)).  In the context of a border inspection, a detention turns into an arrest "when 'a reasonable person would believe that he is being subjected to more than the temporary detention occasioned by border-crossing formalities.'" *United States v. Price*, 921 F.3d 777, 790 (9th Cir. 2019) (quoting *Bravo*, 295 F.3d at 1009).  And "[a]lthough the existence or non-existence of probable cause might be one factor to consider in determining someone's custodial status . . . , what ultimately matters to the determination of whether *Miranda* is triggered is *custody*, which is determined not by the existence of probable cause, but by looking to the 'objective circumstances of the interrogation.'"  *Butler*, 249 F.3d at 1099 (quoting *Stansbury v. California*, 511 U.S. 318, 323 (1994)).

Thus, in determining whether an individual being interrogated is "in custody," the court must look at the "objective circumstances of the situation, or whether a reasonable innocent person in such circumstances would conclude that after brief questioning he or she would not be free to leave." *Bravo*, 295 F.3d at 1009 (citations, quotation marks and emphasis omitted).[7]  The Ninth Circuit has identified factors to consider when looking at the objective circumstances of an

---

[7] More recently, *Price* articulated the test as requiring a court to "ask, considering the totality of the circumstances, whether a reasonable innocent person in such circumstances would conclude that after brief questioning he or she would not be free to leave."  921 F.3d at 790 (internal quotation marks and emphasis omitted).

interrogation, including: (1) "the language used by the officers"; (2) "the physical characteristics of the place where the question occurs"; (3) "the degree of pressure applied to detain the individual"; (4) "the duration of the detention"; and (5) "the extent to which the person was confronted with evidence of guilt." *Butler*, 249 F.3d at 1099 (citation omitted).

## B.     Application of Legal Standards

Considering the totality of the objective circumstances surrounding Salinas' detention, the court concludes that Salinas was not in custody and therefore, no *Miranda* warning was required when she identified her luggage at 11:10 a.m.

First, based on the testimony presented, the court concludes that the language and tone of voice of the CBP officers, at all times except when Durante used a raised voice and banged on the plane's door attempting to get the attention of the flight crew, was courteous, professional, and conversational.

Second, as to the physical characteristics, the Signature lounge is a public area with comfortable seating (including at least three leather sofas, one leather chair, and two tables with chairs), amenities such as vending machines, and bathrooms. *See* Gov't. Ex. 52. Passengers, crew, and members of the public were present during the detention. Although they were not allowed to leave during the

inspection, they were not otherwise restrained—no handcuffs were used,[8] no

weapons were displayed, there is no evidence that they were locked in, and no

officers used threats or bodily force to restrain anyone.

Third, there was no pressure or threatening language being used at any

time to restrain Salinas during her detention in the Signature lounge, the pat-down

in the bathroom, when she was summoned to identify her luggage, and when she

was asked to identify her luggage in the hangar.

Fourth, there is no evidence that Salinas was presented with evidence

of her guilt. No currency was brought into the Signature lounge. When Salinas

was taken to the hangar and asked to identify her bags, no currency had been

removed and/or confiscated from her bags. Although those detained in the

Signature lounge could have seen CBP officers inspecting the cargo luggage in the

hangar for a period of time, there is no evidence that Salinas observed any

particular part of the inspection or discovery of weapon parts. And Salinas

obviously did not see agents inspecting the inside of the plane.

The final factor—length of detention—while certainly more troubling,

is not sufficient to establish that Salinas was in custody at 11:10 a.m. Salinas'

detention lasted approximately five and a half hours—from 5:45 a.m., when she

---

[8] "Handcuffing is a substantial factor in determining whether an individual has been arrested—although it alone is not determinative." *Price*, 921 F.3d at 790 (citations and quotation marks omitted).

was told to disembark from the plane until 11:10 a.m., when she was asked to identify her luggage in the hangar. While the Ninth Circuit has recognized that the "duration of detention is critically important" *outside* of the border context "in determining whether a stop has become an arrest," *United States v. Guzman-Padilla*, 573 F.3d 865, 886 (9th Cir. 2009) (quoting *United States v. Patterson*, 648 F.2d 625, 632 (9th Cir. 1981)), it has also held that the puncturing of a vehicle's tires during an extended border search, thereby causing a *lengthy* detention, did not transform the border stop into an arrest, *id.* at 885-86 (noting that under the border search doctrine, the government's powers are at their zenith and therefore, a lengthy delay alone is insufficient to constitute an arrest) (citation omitted). *Cf. United States v. Montoya de Hernandez*, 473 U.S. 531, 542-44 (1985) (holding that a defendant's more than 16-hour detention at the international border—which allowed CBP officers time to verify or dispel their reasonable suspicion of criminal smuggling activity—was reasonable, in part, because "at the international border . . . the Fourth Amendment balance of interest leans heavily to the Government").

Similarly, *United States v. Nava*, 363 F.3d 942 (9th Cir. 2004), determined that a lengthy border detention was not an arrest. *Nava* held that a defendant's "being asked to leave his truck, being handcuffed and told it was for safety reasons, being escorted in handcuffs to the security office, having had a pat down search conducted, and being forced to wait in the locked security office

while his truck was searched did not constitute an arrest under the Fourth Amendment." *Id.* at 946. Rather, the detention did not turn into an arrest until two hours later, when drugs were found in his truck. *See id.* at 943. *See also United States v. Sanchez*, 2015 WL 1873208, at *5 (S.D. Cal. Apr. 23, 2015) (holding that border detention did not become an arrest until nearly two hours after initial contact with border security when the defendant was moved from a security office to a detention cell).

   *Butler* instructs that a detention becomes an arrest not when contraband is found, but rather, when a defendant's changed circumstances would leave a reasonable person to believe she was no longer free to leave. *Butler*, 249 F.3d at 1100-01 (discussing *United States v. Juvenile (RRA-A)*, 229 F.3d 737 (9th Cir. 2000)). *RRA-A* held that a detained defendant was not in custody until customs agents handcuffed her to a bench in a locked security office after finding drugs in her vehicle. 229 F.3d at 743. *Butler* explained that "the key to [*RRA-A's* holding] is not that the drugs had been found, but that to a reasonable person, being handcuffed to a bench for hours in a locked office is more than a temporary detention occasioned by [routine] border-crossing formalities." 249 F.3d at 1100. *See also United States v. Doe*, 219 F.3d 1009, 1014 (9th Cir. 2000) (finding that defendant was not in custody when taken to a security office, searched, and told to wait while his vehicle was searched, but once drugs were found *and* he was moved

to a detention cell, "no reasonable person would have believed he was free to leave").

Here, CBP officers conducted an inspection of the plane, passengers, and luggage, during which they discovered not only large amounts of undeclared currency, but also weapon parts. The inspection lasted at least until CBP officers identified which passenger was allegedly attempting to smuggle large amounts of undeclared currency. That is, although Salinas was detained for several hours, during that time, CBP officers were actively engaged in their inspection. And although Haney knew as early as 7:30 a.m. that there was probable cause that a currency smuggling crime had been committed by *someone*, she did not know *who* because the ownership of the black suitcase was unknown. Thus, she did not have probable cause to arrest Salinas until 11:10 a.m., when Salinas confirmed that the black carry-on suitcase was hers.

Considering the totality of these circumstances, even though the detention was lengthy, the court finds that Salinas was not in custody at 11:10 a.m. when she identified her luggage.

Salinas' reliance on *United States v. Hernandez*, 476 F.3d 791 (9th Cir. 2007) is not persuasive. In that case, while stopped at a customs inspection station, Hernandez was "surrounded by six CBP officers, ordered out of his car, ordered to place his hands on top of the vehicle and subjected to a pat-down." *Id.*

at 796. During the pat-down, a custom officer "felt and pulled out . . . an opaque cellophane bag" from Hernandez's pants pocket, and asked Hernandez "what is this?" *Id.* at 795. Hernandez did not respond. *Id.* The court explained that Hernandez was clearly detained because "[i]f he had tried to leave, he would have been stopped." *Id.* at 796. The Ninth Circuit determined that under these circumstances, "a reasonable person in Hernandez's position would not have felt free to terminate the inspection by the CBP officers and leave" and therefore, "Hernandez was under custodial interrogation" and his silence in response to the officer's question was inadmissible. *Id.*

First, to the extent *Hernandez* held that being detained during a pat-down constitutes custody, it appears to be at odds with Ninth Circuit law recognizing that merely being detained and unable to leave during a CBP inspection does *not* constitute custody. *See Price*, 921 F.3d at 790 (explaining that a detention turns into an arrest "when 'a reasonable person would believe that he is being subjected to *more than the temporary detention* occasioned by border-crossing formalities'" (quoting *Bravo*, 295 F.3d at 1009) (emphasis added)); *see also United States v. Medina-Villa*, 567 F.3d 507, 519-20 (9th Cir. 2009) holding that defendant was not in custody during CBP field interrogationofficer *blocked defendant's car to prevent escape*, approached with gun drawn, and interrogated defendant about citizenship and immigration status); *United States v. Cervantes-*

*Flores*, 421 F.3d 825, 829-30 (9th Cir. 2005) (per curiam) (determining that defendant was not in custody when he was chased by a border patrol officer into the desert, subdued, and *handcuffed for questioning*), *overruled in part on other grounds by Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009); *United States v. Gonzalez*, 448 F. App'x 714, 715-16 (9th Cir. 2011) (unpublished) (holding that defendant was not in custody because he was "no more restrained, no more isolated, and no more subject to law enforcement domination than the [*Medina-Villa* and *Cervantes-Flores*] defendants").

Second, although not clear, *Hernandez* may have found that a reasonable person in Hernandez' position—after an opaque cellophane bag the size of an open hand was pulled out of his pocket—would have felt that he was subjected to more than a temporary detention occasioned by border crossings. That is, the court may have determined that Hernandez was under arrest once the cellophane bag was removed from his pocket.

And the out-of-circuit cases on which Salinas relies—holding that once the focus of an inspection becomes a criminal investigation, it is no longer a routine border inspection—are easily distinguishable. In each case, not only did the focus become a criminal investigation, but there was other evidence suggesting the individual was under arrest at the time of questioning. *See United States v. Molina-Gomez*, 781 F.3d 13, 22-23 (1st Cir. 2015) (finding that border inspection

was no longer routine and defendant was therefore in custody based on the totality of circumstances—the defendant's detention in a small, windowless room with at least two customs officers asking probing questions about potential illegal activity, for one and a half to two hours); *United States v. Chavira*, 614 F.3d 127, 133-34 (5th Cir. 2010) (holding that a detention became an arrest when "the case changed from a routine immigration case to an essentially criminal law enforcement case," which occurred *after* CBP officers knew that the defendant had made a false statement, moved her to a secondary processing area for further questioning, handcuffed her to a chair in a small windowless room, and subjected her to increasingly accusatory questioning regarding the falsity of her statement); *United States v. Tudoran*, 476 F. Supp. 2d 205, 214 (N.D.N.Y. 2007) (finding that a defendant was subjected to custodial interrogation requiring *Miranda* warning where border officers had probable cause to arrest the defendant for evading inspection and falsely claiming citizenship, handcuffed him in a small room, retrieved items from his clothing, and asked questioned designed to elicit criminally incriminating information).

///

///

///

///

In sum, Salinas' statements at 11:10 a.m. identifying her luggage were not the result of a "custodial interrogation" for purposes of *Miranda*. The statements are admissible.

## IV.  CONCLUSION

Based on the foregoing, Defendant's Motion to Suppress, ECF No. 45, is DENIED.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, October 7, 2019.



    /s/ J. Michael Seabright
    J. Michael Seabright
    Chief United States District Judge

*United States v. Salinas*, Cr. No. 18-00108 JMS, Order Denying Defendant Felina S. Salinas' Motion to Suppress Statements, ECF No. 45